UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

KAREN CLARK                                                        PLAINTIFF

v.                                              CIVIL ACTION NO. 3:05CV-344-S

SANOFI-SYNTHELABO, INC.                                           DEFENDANT

## MEMORANDUM OPINION

This matter is before the court on motion of the defendant, Sanofi-Synthelabo, Inc.[1], for summary judgment in this action alleging age and gender discrimination, retaliation, and wrongful discharge.  This action was originally filed in the Jefferson County, Kentucky, Circuit Court.  It was removed to this court under our diversity jurisdiction.  The plaintiff, Karen Clark, is said to be a resident of Indiana, and the defendant, Sanofi-Synthelabo, Inc.[2] ("Sanofi"), a Delaware corporation with its principal place of business in New York.

Sanofi moved for summary judgment (DN 24).  Clark moved for leave to file a second amended complaint, seeking to add a wrongful termination claim.  The court granted Clark's motion, and an additional sixty-day discovery period in which to develop the claim.  Sanofi then moved for summary judgment as to this additional claim (DN 42).  Both motions are presently before the court.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent

---

[1] Now Sanofi-Aventis U.S. LLC.

[2] The notice of removal averred that Sanofi was a citizen of New Jersey with its principal place of business in New Jersey at the time of removal.

summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

## I.  Facts

The following facts are either undisputed or have been taken in the light most favorable to Clark for purposes of summary judgment.

### A.  Karen Clark

Karen Clark was born in 1956.  She is a licensed registered nurse, holding a bachelor of science degree in nursing and a master's degree in business administration.  Beginning in 1995, Clark worked at Jewish Hospital as a cardiovascular nurse specializing in ICU and open heart recovery.  In 1998 she began working for Spectra Care as a home-health nurse and later as a cardiopulmonary sales representative selling infusion products to cardiologists and pulmonary specialists.  In May of 2000, Sanofi hired Clark as a hospital-based pharmaceutical sales representative.  Clark held a position known in the industry as a "specialty rep," selling primarily cardiovascular drugs such as Primacor, Plavix, Avapro and Avalide to cardiologists in area hospitals.

Clark worked for Sanofi for three and a half years until her resignation on November 1, 2004.  She was very successful in sales.  In 2001, she achieved 109% of her sales goals and achieved an overall rating of "exceeds expectations" on evaluation by District Manager Mary Ann Brokamp.

From October 2002 to September 2003 Clark was in the top 5% of Sanofi sales representatives[3] nationally. In February, 2004, she was ranked third in sales of 200 sales reps nationally and second in the area. In March, 2004, she was ranked first in sales of 200 nationally and first in the area. In June, 2004, she was ranked second in the nation and first in the area.

## B. Brett Poole

During her employment with Sanofi, Clark had four direct supervisors: Joe Parrott, Mary Ann Brokamp, Brett Poole, and Sandy Bennett. Brokamp rated Clark's overall performance for 2001 as "exceeds expectations." In October 2002, Brett Poole became Clark's supervisor. Clark and Poole did not develop a good working relationship. In April, 2003 Poole generated a performance evaluation for Clark for the year 2002 giving her an overall performance rating of "meets expectations." The percentage of a sales rep's annual raise, if any, was tied directly to the evaluation. Poole had only supervised Clark for two to three months in the year 2002. These evaluations were based in large part on the subjective observations of reps' immediate supervisors.

Clark confided in another supervisor, Sandra Bennett, about Poole's behavior. Bennett gave Clark the name and phone number of the of the Human Resources Manager, Jim Luisi, for purposes of making a complaint. Bennett told her that the only thing she knew that Clark could do to rectify the situation was to make a report. She told Clark that Luisi was a man that she could trust. In October 2003, Clark made a verbal complaint to Luisi. She told Luisi that she was uncomfortable being in a car with Poole, that he made comments about women and the sexuality of her co-workers, and that he told his supervisees, including her, to sell off-label[4] and to use unapproved materials. She told Luisi that Poole was asking employees to do things that were illegal, and that she had been told that she would not succeed in management because she was female, a new mom, and from

---

[3] For simplicity, the various positions will be referred to by the shorthand terminology "sales rep" or "rep."

[4] Off-label selling includes promoting pharmaceutical products through the use of sales literature not approved by the Food and Drug Administration.

Kentucky.  Clark told Poole that she had contacted Luisi about his conduct.  Clark contends that she was retaliated against beginning at that time and continuing until her resignation in November of 2004.

### C.  Positions

A number of changes occurred in the Sanofi sales structure in 2003.  First, a special sales force known as the SWAT Team was created.  It consisted of seventy-eight individuals who were hired as specialty representatives to target sales of Avapro in specialized and predetermined markets. All but one of these individuals were hired from outside Sanofi.  The one individual who came from within the organization was in a position that was being eliminated.  He had eighteen years of experience.  Sanofi treated him as an "outside hire" due to the elimination of his position, and hired him for a SWAT Team position in a territory for which there were no qualified outside applicants. Although there were current Sanofi employees who were interested in SWAT Team positions, all but one hire came from other pharmaceutical companies and were hired for their knowledge of competing products.  Clark did not apply for a SWAT Team position.

Clark was moved into an office-based specialty sales position in January, 2004 when Sanofi took on the sole responsibility for marketing the drug Arixtra.  Prior to that date, Sanofi had co-promoted the drug with a company called Organon.  In 2004, Sanofi assumed marketing responsibility for the Arixtra product line and merged the cardiovascular hospital rep and Arixtra specialty rep sales forces.  A younger woman, Cindi Carman, an Arixtra rep, was assigned to the new merged hospital-based position, displacing Clark from the hospital venue.  Carman testified that she and other reps were told of the realignment and merger of the sales forces, and were told that if they wanted an office-based position they were to request one.  Carman did not request an office-based position.

### D. Sandra Bennett

Upon Clark's reassignment to an office-based specialty position, Sandra Bennett became her immediate supervisor.  Clark contends that Bennett instructed her supervisees to sell off-label and to create a binder with unapproved reprints for use during sales presentations.  She testified that she made the binder but never used it in her presentations.  Bennett kept a log of notes concerning Clark's work performance from January through November, 2004 while she was Clark's supervisor.  Bennett did not think that Clark had good peer-to-peer relationships with her co-workers.  The notes document several conflicts with other reps.  In particular, there were some problems noted with Cindi Carman and hospital contacts.  Bennett held Clark responsible for the difficulties.  In her view, Clark was improperly infringing on Carman's position as the new hospital rep.  In fact, after an incident in April, Bennett advised Clark that she no longer had hospital privileges.  Bennett copied her supervisor, Regional Manager, Kristi Pendlebury, on her e-mail correspondence with Clark and kept her apprised of her concerns about Clark's performance.

Also in April, 2004, Bennett prepared a 2003 performance evaluation of Clark.  Since she had not herself supervised Clark during 2003, a "mostly meets expectations" overall performance rating was given to Clark on the recommendation of Brett Poole, Clark's former supervisor.  This evaluation, which was lower than her previous year's rating of "meets expectations," entitled her to only a 2% raise.  In 2001 Clark was rated at "exceeds expectations" which earned her an 8% raise.  Clark contested the 2003 "mostly meets expectations" rating.  Poole was asked to add additional information to Clark's evaluation to justify his recommendation.  Clark ultimately received a "meets expectations" rating and a 4% raise.

In August of 2004, Bennett's supervisor, Regional Manager Kristi Pendlebury, rode with Clark on a day of sales calls.  Clark believed that Sanofi was trying to find a way to fire her and that Pendlebury was looking for bases to criticize her performance.  Clark said that Pendlebury volunteered stories about firing other reps and that she criticized Clark's appearance and skills.

Clark said that she was told to ride with Becky Hankins, a younger specialty rep in the Lexington territory who ranked first in the nation in May and July, 2004.  Clark rode with Hankins.  Clark stated that Hankins wore a short skirt, no pantyhose, open-toe shoes, her hair in a ponytail, sunglasses on her head, and that she used homemade visuals.  Clark states that she had been told to emulate this younger sales rep, but had herself been criticized by Pendlebury for wearing open-toe shoes, no pantyhose, slacks and sunglasses on her head.  Clark testified that she brought these matters to the attention of Bennett and Pendlebury.

Clark became depressed in mid-2004 and was prescribed an antidepressant by her physician. She resigned from Sanofi on November 1, 2004.  Clark repeatedly requested that Sanofi accept her relinquishment of company property.  In July, 2005 an outside company collected the items from her.

### E.  Salaries

Clark was hired in May of 2000 at a base salary of $55,000.00.  She received various increases, either merit or equity adjustment, and was earning a base salary of $79,040 in April of 2004.

SWAT team reps, Patrick Masden, Rebecca Hankins and James Gaither, were hired at higher base salaries than Clark.  The SWAT Team was a separate sales force from the hospital-based specialty rep group for which Clark had been hired.  In April, 2003, Clark's base salary was $68,310.00.  Masden was hired at a base salary of $75,000.00, Hankins at $85,000.00, and Gaither at $80,000.00.  Sanofi was able to hire these individuals away from other pharmaceutical companies by offering these salaries for this particular sales force.  Sanofi determined to fill the SWAT team positions with "outside hires"specifically for their experience in the target markets for Avapro drug sales and for their knowledge of competing products.  Masden, Hankins and Gaither were all under the age of forty.

- 6 -

Additionally, Sanofi hired Todd Cochran and Ian Niles, both also under the age of forty. They were hired as hospital-based specialty reps.  Clark was hired for such a position in May of 2000 at $55,000.  Cochran was hired in November of 2002 at $69,000.00.  Niles was hired in July of 2003 at $73,000.00.  In January of 2004, Clark received an equity adjustment, increasing her salary from $68,310.00 to $76,000.00.[5]

## II.  Analysis

### A.  Discrimination Claims

Clark alleges that she was discriminated against on the basis her gender (female) and her age (over forty years old).  This action is brought under the Kentucky Civil Rights Act, KRS 344.010, *et seq.*  The court, sitting in diversity, must apply the law of the state in which it sits.  Thus Kentucky law applies to these claims.  Kentucky courts addressing claims brought under Chapter 344 look to federal law for guidance, as the state statute is virtually identical to the federal statute.  *White v. Rainbo Baking Co.*, 765 S.W.2d 26, 28 (Ky.App. 1988).

> A plaintiff may establish age- or gender-based discrimination in two different ways. He may offer direct evidence of the employer's discriminatory motive by producing "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Mitchell v. Vanderbilt Univ.* 389 F.3d 177, 181 (6th Cir. 2004)(quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)(en banc)).  If he cannot come forward with evidence of a discriminatory motive, he may offer indirect and circumstantial evidence of such a motive under the familiar *McDonnell Douglas* burden-shifting approach.  *Id.* (citation omitted).

*Freeman v. Potter*, 200 Fed.Appx. 439 (6th Cir. 2006).

Under the burden-shifting framework articulated in *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973), a plaintiff must make a *prima facie* showing of discrimination on the basis of gender

---

[5]The Amended Complaint alleges that"[i]n December, 2002, Defendant hired two male employees with starting salaries of $90,000..."  There does not appear to be record evidence that any employees were hired at starting salaries of $90,000.00 in 2002. In their briefs, the parties discuss the hiring of four male employees during 2002 and 2003.  The court will therefore address all four of these "new hires, although the complaint alleges only two."

or age.  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action.  Upon such an articulation, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason was merely a pretext for discrimination.  The elements of a *prima facie* case are fact-specific and differ from case to case. *Freeman*, 200 Fed.Appx. at 442, *citing, Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999).

### (1) Gender Discrimination

The plaintiff contends that four male employees, Patrick Masden, James Gaither, Todd Cochran, and Ian Niles, were hired at higher starting salaries than she received.

Clark argues that these males were hired into the company at a higher salary than Clark received in that year.  This is a comparison of "apples to oranges."  She has cited no authority for the proposition that Sanofi was constrained to hire new employees at a salary no higher than she was receiving on any given day.  Further, Clark received at least one equity adjustment to raise her salary to the level of the current market.  Additionally, the only apt comparison of starting salaries would be between Clark's starting salary and those of the male employees.  However, Clark has not made the argument that there was discrimination in hiring Clark at a starting salary of $55,000.00 in 2000 and Masden and Gaither at $75,000.00 and $80,000.00 respectively in 2002/2003.

In any event, in order to compare the starting salary of Clark with those of Masden and Gaither, they must be shown to have been similarly situated in all relevant respects.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).  It is uncontroverted that Masden and Gaither were hired for the SWAT Team, a specialized sales force created in 2002 to more aggressively promote Avapro to a target market.  Despite Clark's own assessment that she was a qualified candidate for such a position,[6] Sanofi sought and hired sales reps from other

---

[6]She did not apply for a SWAT Team position, as current employees were informed that Sanofi would not hire from within
(continued...)

pharmaceutical companies, paying them large salaries to convince them to accept positions with Sanofi.  The only exception to this practice was a Sanofi employee with eighteen years of experience whose position was being eliminated.  He was hired for the SWAT Team in a territory where Sanofi had not found any qualified outside applicants.  There is no evidence to suggest that this male individual was given preferential treatment over Clark.  She did not apply for a SWAT Team position, and she was located  in a territory where there were qualified outside candidates.

Additionally, there were females hired for SWAT Team positions.  In addition to Masden and Gaither, Sanofi also hired Rebecca Hankins for the SWAT Team at a staring salary of $85,000.00.  Thus even among the hires for the SWAT Team, both men and women were hired for the positions at large starting salaries.

In sum, (1) Clark did not apply for a SWAT Team position, (2) both men and women were hired for the positions, and (3) Clark's starting salary in 2000 cannot be compared to the SWAT Team salaries in later years, as the SWAT Team was a specially created sales force which has not been shown to be  comparable to the specialty sales position for which Clark was hired.

Clark also contends that Todd Cochran and Ian Niles were treated more favorably when they were hired as hospital-based specialty reps in November, 2002.  They were hired for positions in other markets, Cincinnati and Columbus, Ohio.  Cochran received a starting salary of $69,000.00 and Niles received $73,000.00.  Clark does not dispute that in 2002, the market required higher starting salaries for experienced pharmaceutical sales persons, and that she received a $10,000.00 equity adjustment to bring her salary in line with the salaries of new hires.  There has been no evidence offered to suggest that gender played a role in the higher starting salaries paid to Cochran and Niles.

Clark has failed to make a *prima facie* showing of gender discrimination.

---

[6](...continued)
for this sales force.

(2) Age Discrimination

Clark also alleges age that there was a disparity in pay and a failure to promote her on the basis of her age.  Masden, Gaither, and Hankins were all under the age of forty at the time they were hired at higher starting salaries than Clark had received.  For the same reasons that Clark's gender discrimination claim fails, her age discrimination claim is also deficient.

First, Clark did not apply for a SWAT Team position.  Second, as this was a newly-created specialty sales force, these positions and Clark's hospital-based position are not comparable for purposes of comparing salaries.  Further, Sanofi has shown that it recruited experienced reps from other pharmaceutical companies for the SWAT Team and had to pay large salaries to obtain them.  There has been nothing offered to suggest that this hiring practice bore any relation to the age of the candidates.  Clark therefore has shown no ground to challenge this business decision to hire outside the company, or to challenge the salaries paid to these recruits.

Clark contends that she was discriminated against when Cindi Carman, a woman under the age of forty, was assigned to the hospital-based position and Clark was moved to the office-based specialty position when sales forces were merged for the marketing of Arixtra.  Clark contends that this reassignment was a demotion.  Sanofi disputes that this was a demotion.  Rather it urges that it was a lateral transfer, as Clark was placed in a specialty position rather than in an entry-level general office-based position.  Clark urges that Sanofi equivocates on this point.  She claims that Poole told her that she was being demoted and that the reassignment was viewed as such.

There is a genuine issue of material fact concerning whether this move to an office-based position constituted an adverse employment action.

> A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Brooks v. Lexington-Fayette County Housing Authority*, 132 S.W.3d 790, 802 (Ky. 2004).  It is not entirely clear whether this position was one of less prestige.  Clark testified that she was told by Poole that she was being demoted, and that she felt that the reassignment to an office-based position was a demotion.  More concretely, however, Clark lost the ability to interact with the physicians with whom she had established relationships in the hospital setting both before her tenure with Sanofi and during her employment as a hospital-based rep.

Taking the evidence in the light most favorable to Clark, for purposes of summary judgment, we conclude that Clark has made a *prima facie* showing that she suffered an adverse employment action.  David Lillback, Vice President for U.S. Human Resources for Sanofi, stated in his affidavit that he had oversight responsibility for the "business rule" which governed the placement of the reps in the merger of the sales forces.  He averred that upon the merger,  only one hospital-based rep remained assigned to each territory.  The incumbent Arixtra representative in each territory was given the "right of refusal" for the newly merged hospital-based position.  A displaced hospital-based rep was reassigned to a newly created office-based specialty position  The offering of a "right of refusal" for the hospital-based position might suggest, in conjunction with other testimony, that this was seen as the preferable position.  But assuming for purposes of this opinion that Clark was demoted, there has been no evidence offered to suggest that Clark was reassigned to the office-based position because of her age.

Lillback testified that the "business rule" for the reassignment of current employees after the sales force merger was applied uniformly across the board throughout the company.  Clark contends that this statement is untrue because (1) Carman was not offered a "right of refusal" of the position but rather received it by default, and (2) William Pope Beeler, a Lexington, Kentucky, hospital-based rep was able to keep a hospital-based position after the merger.

Carman testified that she was told that if she was interested in an office-based position, to inform management.  Otherwise, the realignment of positions would take place without further

- 11 -

employee input.  This directive that Carman make an affirmative statement to obtain reassignment to an office-based position was a right of first refusal for the new hospital-based position.  To exercise the right of refusal, Carman would have had to request reassignment to an office-based position.  Her lack of such a request indicated her preference for staying in the hospital-based environment.  Thus Carman's assignment to the hospital-based position was in accord with the business rule.  There has been nothing offered to suggest that the realignment of positions was in any way related to Clark's age.

Beeler was able to keep a hospital-based position because there was not an Arixtra representative in his territory.  Beeler testified that the Arixtra salesperson in Lexington, an employee of partner company Organon, had taken another position and the Arixtra sales position was vacant.  Clark has not offered any evidence to contradict Beeler's testimony.  Thus there was no exception to the business rule utilized for Beeler.  Rather, there was, by happenstance, no Arixtra rep to be given the right of refusal.  Beeler was the incumbent hospital-based rep.  Again, the assignment of Beeler to the hospital-based position was in accord with the business rule.  There is no evidence to suggest that Clark's reassignment to an office-based position was related to her age.

Clark has failed to make a *prima facie* showing of age discrimination.

## B.  Retaliation Claims

Clark claims that she was retaliated against for having reported Poole to management in October , 2003 for allegedly making derogatory and sexual remarks about females.  She also reported that Poole told her that she could not obtain a management position with Sanofi because

she was a new mother.[7]  She contends that after telling Poole that she had reported his conduct she was retaliated against by Poole, Bennett and Pendlebury until her resignation on November 1, 2004.

Clark alleges that although she did not receive any substantive answers from management, she continued to inquire about the investigation into her complaint.  In these inquiries, she complained that Bennett and later Pendlebury were harassing her and criticizing her job performance.

In order to prove a *prima facie* case of retaliation, Clark must establish that (1) she engaged in activity protected by the civil rights statutes; (2) the exercise of this right was known to Sanofi; (3) Sanofi thereafter took an adverse employment action against Clark, or Clark was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

Under the civil rights statutes, it is "an unlawful employment practice for an employer...to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this title..."   42 U.S.C. § 2000e-3(a).  In this instance, the "protected activity" which Clark claims to have engaged in was opposing a practice made an unlawful employment practice under the act; that is, the reporting of Poole's objectionable conduct to management.

Clark need not have presented a legally redressable hostile environment claim to her superiors to now state a claim for retaliation for having made the report.  However, we agree with the position taken by the court in *Taylor, supra.,* which quotes *Harper v. Blockbuster Entertainment*

---

[7]She reported other alleged conduct as well.  She claimed that Poole patted a female employee on the buttocks, made derogatory remarks about homosexuals, and suggested that his supervisees sell off-label.  The sexual touching allegation is not contained in the complaint.  The making of derogatory comments concerning homosexuals is alleged but does not relate to any statutorily protected activity.  The off-label selling allegation was added in the Second Amended Complaint under a claim of wrongful discharge in violation of public policy.  This claim is addressed later in this opinion.

*Corp.*, 139 F.3d 1385 (11th Cir. 1998), that at a minimum, Clark must have had a good faith, reasonable belief that Poole was engaged in an unlawful employment practice when she reported him. *See, Taylor*, 84 F.Supp.2d at 1255-1257.[8]

As noted in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998), the civil rights statutes are not intended to establish a "civility code." Thus the Supreme Court, and the Sixth Circuit following suit, have held that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would  find hostile or abusive–is beyond the [statutory] purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [statutory] violation." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295(1993); *Morris, supra*., at 790.

Clark reported that Poole had engaged in derogatory and sexually harassing behavior toward females.  However, Clark testified in her deposition that he had only infrequent contact with her during the time he supervised her.  In fact, she contends that he had *so little* contact with her that he could not possibly have had enough familiarity with her selling skills to be able to evaluate her job performance.[9]  She testified that her exposure to Poole's offensive behavior was limited to the initial group meeting after he became her supervisor, two occasions when he rode with her on sales calls, and a meeting at the airport concerning her performance evaluation.  Poole was Clark's supervisor from October, 2002 until Clark's reassignment to an office-based position in January, 2004.  The court concludes on the present facts that Clark's reporting of Poole's conduct does not qualify as "protected activity" as required by statute.  The conduct which she reported does not amount to a

---

[8]The Sixth Circuit does not appear to have yet been faced with this precise question.

[9]Beeler confirmed in his deposition Clark's assertion that Poole was a "hands off" manager.

- 14 -

legally redressable hostile environment claim. *See, Taylor v. Renfroe Corp.*, 84 F.Supp2d 1248 (N.D.Ala. 2000). The Eleventh Circuit Court of Appeals stated in *Clover v. Total System Services, Inc.*, 176 F.3d 1346 (11th Cir. 1999) that with respect to retaliation claims, the conduct complained of, and the reporting of which spawned the alleged retaliation, need not amount to sexual harassment *per se*, but "must be close enough to support an objectively reasonable belief that it is."

In assessing whether a hostile or abusive work environment has been created, the court must look at the circumstances as a whole and may consider (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; (4) and whether it unreasonably interferes with an employee's work performance. *Harris*, 114 S.Ct. at 371. Taking the facts alleged by Clark as true, no reasonable juror could find that there was such severe and pervasive harassment as would alter the terms and conditions of employment of a reasonable person in Clark's shoes. This is principally so because Poole was essentially an absentee supervisor and Clark's face-to-face contact with him was sporadic at best.

Having found that Clark's subjective view of Poole's conduct does not meet an objective standard of reasonableness, we conclude that Clark did not engage in "protected activity" for which she is entitled to statutory protection against retaliation. Therefore, none of the conduct which she identifies as retaliatory can be found to constitute relation for engaging in protected activity under the civil rights statutes.

Even if the court concluded that Clark's reporting of Poole's conduct did constitute the requisite protected activity, we would still conclude that Clark has failed to make a *prima facie* showing of retaliation. Clark contends that her reassignment to an office-based position was the result of her complaint about Poole. However, there is no evidence to support that contention. Clark stated in her deposition that she suspected that her perceived "demotion" was because of angering Poole. She stated that she asked him if it had to do with their strained relationship and he responded cryptically, "Maybe." In fact, Poole's affidavit as well as the affidavit of Lillback and the deposition

of Bennett establish that, in fact, managers did not have any input on the formulation or application of the "business rule" governing the realignment.

Clark urges that her 2003 review, which she received in 2004 from Bennett, her current supervisor, was a retaliatory collaboration between Bennett and Poole.  Bennett did not supervise Clark during 2003, so the source of information upon which the review was based was Poole.  Clark contends that the review was arbitrary and designed to punish her, as Poole did not have any documentation to support the decision to lower her overall rating to "mostly meets expectations." Both Bennett and Poole acknowledge that the portion of the review which resulted in a lower rating for Clark are subjective assessments of her proficiency in selling and peer-to-peer relationships. Clark contends that no valid subjective assessment of her skills could have been made by Bennett who did not supervise her during 2003, or by Poole who only rode with her on calls twice during the year and had no more than infrequent in-person contact in supervising her.

Clark received only a two percent raise based upon this "mostly meets expectations" rating. She sought a review of her evaluation, and Poole was asked to justify the rating he had given her. Upon review, her overall rating was upgraded to "meets expectations" and her raise was increased to 4%.

We conclude with respect to her 2003 evaluation that she has failed to establish a *prima facie* case of retaliation.  Under Sixth Circuit authority, Clark must show that she suffered a materially adverse change in the terms and conditions of her employment to state a claim for retaliation.  *See, Hollins v. Atlantic Company, Inc.*, 188 F.3d 652 (6th Cir. 1999).  With respect to this review, Clark contends that because she was a top-ranked sales rep she should have received an "exceeds expectations" rating and a 7-10% raise.  She has come forward with no evidence to support such a correlation.  She asserted in her deposition that other top sales persons earned bigger raises, but there has been no evidence offered to support this statement.  Further, Clark has not come forward with evidence to controvert Sanofi's evidence that sales numbers are only one component utilized in

- 16 -

reaching the overall rating, and that sales performance, which is subjectively assessed, is another large component in the calculus. Finally, Clark challenged the subjective assessment portion of her evaluation and won. Management sought justification for the rating from her supervisor, not satisfied with his explanation, upgraded her overall rating to "meets expectations." Her raise was increased from 2 to 4% accordingly. In *Hollins*, 188 F.3d at 662, the Sixth Circuit stated that "[s]atisfactory ratings in an overall evaluation, although lower than a previous evaluation, will not constitute an adverse employment action where the employee receives a merit raise. [citation omitted]." The court concludes that in light of Sanofi's review and amendment of her rating and the increase in her raise to 4%, Clark has not shown that she suffered a materially adverse employment action to support a claim of retaliation.

Finally, Clark claims that Bennett and Pendlebury criticized and humiliated her to the point that she became depressed and resigned from her employment. Sanofi does not deny that it watched Clark closely after her reassignment to the office-based position and that Bennett documented problems she perceived with Clark's performance. Despite her excellent sales numbers, Bennett found Clark to be disgruntled and unhappy over her reassignment. While Clark may feel that such scrutiny was unfair, she has failed to show that it was in violation of the civil rights statutes. Bennett and Pendlebury have not been accused of committing any civil rights violations. As noted herein, the civil rights statutes do not establish a "civility code." Employers are not required by law to be nice or to be fair. They are, however, required to abide by the law. While Clark alleges that she was retaliated against for having reported Poole improper conduct, she has failed to show any causal connection between Bennett and Pendlebury's treatment of her in 2004 and the reporting of Poole in 2003. Their contact with Clark began after her transfer from Poole's supervision to Bennett's. As part of a new sales force with different supervisors with different expectations, Clark must come forward with some evidence to support her contention that Bennett and Pendlebury's treatment of her had a connection to this dispute with a former supervisor. She has not offered any such

- 17 -

evidence.  In fact, in her deposition Clark testified that she confided in Bennett in 2003 about Poole's behavior and Bennett gave her Jim Luisi's name and phone number in the Human Resources Department.  She advised that she make a complaint, and stated that Luisi was someone she could trust.  Clark told Bennett that after she complained to Luisi that Poole was angry.  Bennett told her that she had to "hang in there and fight."  Thus Clark's contention that in 2004 Bennett and Pendlebury retaliated against her for having reported Poole makes little sense.

The sole incident which arguably bore any connection between Poole and Bennett was the 2003 evaluation which she received from Bennett in 2004.  It is admitted, however, that the evaluation related to a period in which Poole, not Bennett, supervised Clark.  The recommendation for a "mostly meets expectations" rating was made by Poole.  Poole was asked to justify the rating, and ultimately the issue was resolved in Clark's favor.  Clark has, therefore, failed to establish that Bennett and Pendlebury's harsh treatment of her was causally connected to any protected activity.

She has failed to state a claim for retaliation.

### C.  Wrongful Discharge in Violation of Public Policy

The court granted Clark leave to file a Second Amended Complaint to add a claim for wrongful discharge in violation of public policy.  The parties were granted an additional period of discovery in which to develop the claim.  Sanofi has now moved for summary judgment on this claim.

Clark alleges that she was constructively discharged from her employment in violation of public policy.  She contends that Bennett and Pendlebury harassed and humiliated her for having reported that she had been repeatedly asked to sell off-label in violation of 21 U.S.C. § 301aaa.

Under Kentucky law, an employer may discharge an at-will employee such as Clark "for good cause, no cause, or for a cause that some might view as morally indefensible."  *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983), *citing, Production Oil Co. v. Johnson*, 313 S.W.2d 411 (Ky. 1958); *Scroghan v. Kraftco Corp*. 551 S.W.2d 811 (Ky.App. 1977).

An exception to this rule is a discharge which is contrary to a fundamental and well-defined public policy as evidenced by existing law. *Id.* at 732. The public policy must be evidenced by a constitutional or statutory provision. *Id.* This public policy exception has been found not to apply to public policy enunciated in federal law. *Shrout v. TFE Group*, 161 S.W.3d 351, 355 Ky.App. 2005), *citing, Alderman v. Bradley*, 957 S.W.2d 264 Ky.App. 1997); *see also, Goins v. Interstate Blood Bank, Inc.*, 2005 WL 1653611 (W.D.Ky. July 12, 2005).

Despite her clear articulation of 21 U.S.C. § 301aaa as the statutory basis for her wrongful termination claim, Clark urges in her brief the alternative argument that she was asked to violate KRS 517.050 prohibiting the falsification of business records. Clark is seeking to fit a square peg in a round whole with this argument.

KRS 517.050 provides that

> (1) A person is guilty of falsifying business records when, with intent to defraud, he:
>
> (a) Makes or causes a false entry to be made in the business records of any enterprise; or,
> (b) Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of any enterprise; or
> (c) Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position...

The key phrase here is "business records of any enterprise." Assuming *arguendo* that Clark was asked to make homemade visuals and use them on sales calls, that she reported her supervisors for making these requests and that she was retaliated against for having made the report, the conduct in which she was asked to engage did not involve the business records of any enterprise. "Business record" is defined, for purposes of the statute as "any writing or article kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity." The materials for these homemade visuals are not "business records of an enterprise" covered by KRS 517.050. Further, there is no allegation that Clark was asked to defraud the physicians upon whom she called.

- 19 -

At best, Clark alleges that she was instructed to use materials other than those pre- approved by the FDA.  This attempt to fit her claim under the statute governing falsification of business records fails.


### D.  Intentional Infliction of Emotional Distress

In accordance with *Wilson v. Lowe's Home Center*, 75 S.W.3d 229 (Ky.App. 2001), and *Kroger Co. v. Buckley*, 113 S.W.2d 644 (Ky.App. 2003), a KRS Chapter 344 claim preempts a common law claim for intentional infliction of emotional distress.  This claim finds its basis in the wrongful acts alleged in the Chapter 344 claims of the Second Amended Complaint.  Additionally, the court having found each of these claims to be without merit on the evidence of record, a claim for intentional infliction of emotional distress is not supportable on the facts.


For the reasons set forth herein, summary judgment will be granted in favor of Sanofi.  A separate order will be entered this date in accordance with this opinion.